MARK C. FLEMING (*pro hac vice*)
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA  02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000
mark.fleming@wilmerhale.com

ALEX HEMMER (*pro hac vice*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, DC  20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
alex.hemmer@wilmerhale.com

MARIE A.J. VINCENT (SBN 286240)
PANGEA LEGAL SERVICES
350 Sansome St. #650
San Francisco, CA  94104
Telephone: (415) 635-7187
Facsimile: (415) 593-5335
marie@pangealegal.org

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| JOHN DOE,<br><br>                           *Plaintiff*,<br><br>          v.<br><br>CHAD F. WOLF, in his official capacity as Acting Secretary of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; KENNETH T. CUCCINELLI, in his official capacity as Acting Director of U.S. Citizenship and Immigration Services; RICHARD VALEIKA, in his official capacity as Field Office Director, San Francisco Field Office, U.S. Citizenship and Immigration Services; U.S. CITIZENSHIP AND IMMIGRATION SERVICES,[*]<br><br>                           *Defendants*. | Case No. 4:19-cv-03852-DMR<br><br>**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Magistrate Judge Donna M. Ryu<br><br>Date:   March 12, 2020<br>Time:   1:00 p.m. |

---

[*] Defendant Chad F. Wolf is automatically substituted for his predecessor pursuant to Federal Rule of Civil Procedure 25(d).

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION .................................................................................................................... 1

BACKGROUND ...................................................................................................................... 2

    A.    The Statutory and Regulatory Scheme .................................................................. 2

    B.    Plaintiff's Life In The United States And Mexico .................................................. 3

    C.    USCIS's Unlawful Denial Of Plaintiff's I-212 Application ................................... 5

STANDARD OF REVIEW ..................................................................................................... 6

ARGUMENT ........................................................................................................................... 7

I.    USCIS's Decision Is Contrary To Law ........................................................................ 7

    A.    The Government's Nonstatutory Physical-Presence Requirement Is Contrary To Law ................................................................................................................... 8

    B.    The Agency Offered No Lawful Justification For Its Nonstatutory Physical-Presence Requirement ......................................................................................... 11

    C.    The Government's Nonstatutory Physical-Presence Requirement Would Have Devastating Effects For Asylum Seekers Like Plaintiff ...................................... 14

II.    USCIS's Decision Is Arbitrary And Capricious ......................................................... 15

CONCLUSION ...................................................................................................................... 16

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Amerijet International, Inc. v. Pistole,*
   753 F.3d 1343 (D.C. Cir. 2014) ...................................................................15

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
   467 U.S. 837 (1984) ....................................................................7, 12, 13, 14

*East Bay Sanctuary Covenant v. Trump,*
   349 F. Supp. 3d 838 (N.D. Cal. 2018) ....................................................14, 15

*Gonzales v. Department of Homeland Security,*
   508 F.3d 1227 (9th Cir. 2007) ...............................................................13, 14

*Hing Sum v. Holder,*
   602 F.3d 1092 (9th Cir. 2010) ........................................................................9

*Humane Society of the United States v. Locke,*
   626 F.3d 1040 (9th Cir. 2010) ...............................................................7, 15, 16

*INS v. Cardoza-Fonseca,*
   480 U.S. 421 (1987) .......................................................................................14

*Judulang v. Holder,*
   565 U.S. 42 (2011) ...........................................................................................7

*Leng May Ma v. Barber,*
   357 U.S. 185 (1958) .......................................................................................10

*Los Angeles Haven Hospice, Inc. v. Sebelius,*
   638 F.3d 644 (9th Cir. 2011) ........................................................................12

*Matter of Reza,*
   25 I. & N. Dec. 296 (BIA 2010) ..............................................................10, 11

*Matter of Torres-Garcia,*
   23 I. & N. Dec. 866 (BIA 2006) ..........................................................13, 14, 16

*Matter of V-X-,*
   26 I. & N. Dec. 147 (BIA 2013) ....................................................................11

*Motor Vehicle Manufacturers Ass'n of the United States v. State Farm Mutual*
   *Automobile Insurance Co.*, 463 U.S. 29 (1983) .................................7, 15, 16

*Occidental Engineering Co. v. INS,*
   753 F.2d 766 (9th Cir. 1985) ...........................................................................7

*Schneider v. Chertoff*,
    450 F.3d 944 (9th Cir. 2006) ................................................................................7

*Sierra Club v. EPA*,
    671 F.3d 955 (9th Cir. 2012) ..............................................................................12

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944) ............................................................................................12

*Snoqualmie Indian Tribe v. Federal Energy Regulatory Commission*,
    545 F.3d 1207 (9th Cir. 2008) ..............................................................................7

*Tolowa Nation v. United States*,
    380 F. Supp. 3d 959 (N.D. Cal. 2019) ..................................................................7

*United States v. Mead Corp.*,
    533 U.S. 218 (2001) ............................................................................................12

*Whitfield v. United States*,
    543 U.S. 209 (2005) ............................................................................................10

*Wilderness Society v. United States Fish & Wildlife Service*,
    353 F.3d 1051 (9th Cir. 2003) ............................................................................12

**STATUTES**

5 U.S.C. § 706 ................................................................................................6, 7

8 U.S.C.
    § 1101 ....................................................................................1, 4, 9, 10
    § 1158 ....................................................................................................14
    § 1181 ......................................................................................................2
    § 1182 ............................................................................................*passim*
    § 1184 ......................................................................................................2
    § 1227 ....................................................................................................11
    § 1229b ....................................................................................................9
    § 1255 ...................................................................................................2, 9
    § 1401 ......................................................................................................9

**RULES AND REGULATIONS**

Civil L.R. 16-5 ....................................................................................................7

8 C.F.R.
    § 103.2 ...................................................................................................12
    § 212.2 ..........................................................................................13, 14, 16
    § 212.5 ...................................................................................................10

**OTHER AUTHORITIES**

125 Cong. Rec. 23,231 (Sept. 6, 1979) ..............................................................14

U.S. Dep't of Homeland Security, U.S. Citizenship & Immigration Services, *Form I-212 Instructions For Application for Permission To Re-Apply For Admission Into The United States After Deportation Or Removal* (last updated Apr. 27, 2018), https://www.uscis.gov/system/files_force/files/form/i-212instr.pdf ................................................8

*Webster's Third New International Dictionary* (2002) ........................................................................8

Pursuant to Civil Local Rule 7-2, Plaintiff John Doe hereby notices the Court and counsel that on March 12, 2020, at 1:00 p.m., or on such other date and at such other time as the matter may be heard, Plaintiff will, and hereby does, move for summary judgment in this matter.

Plaintiff respectfully requests that the Court enter an order granting Plaintiff's motion for summary judgment, vacating the agency decision, and ordering Defendants to adjudicate Plaintiff's application for consent to reapply for admission to the United States on the merits without regard to his physical location.

## INTRODUCTION

The Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.* ("INA"), authorizes a noncitizen who would otherwise be barred from seeking admission to the United States to obtain the Secretary of Homeland Security's consent to apply for admission if the noncitizen spends ten years outside of the United States and seeks such consent "prior to" his or her "attempt to be readmitted from a foreign contiguous territory." 8 U.S.C. § 1182(a)(9)(C)(ii). The statute says nothing about *where* a noncitizen has to be when he or she seeks consent to reapply; it simply requires that the noncitizen seek such consent before he or she "attempt[s] to be readmitted." In this case, however, the government imposed a nonstatutory requirement that such a request for consent cannot be made if the noncitizen is "in the United States." The government's requirement is unsupported by anything in the statute, which envisions that some noncitizens—like Plaintiff—may be physically present in the United States without being "admitted" or having "attempt[ed]" to be admitted. For Plaintiff and people like him, the government's improper physical-presence requirement stands as an insuperable—and unlawful—barrier to a form of relief that they are by statute allowed to pursue.

Plaintiff is here lawfully, but has not been "admitted" to the United States. After spending decades here and ultimately being removed to his native Mexico in 2003, he briefly re-entered later that year in order to bring his family out of the United States and resettle them in Mexico. He lived in Mexico for over a decade, thus meeting the ten-year requirement for permission to apply for admission. He left Mexico in 2014, after his son was shot by a cartel that threatened to kill Plaintiff and his family. Plaintiff presented himself to a U.S. port of entry and applied for asylum, was found to have a credible fear of future torture, and was granted humanitarian parole so that he could remain

in the United States while his asylum case was pending.  In so doing, he did not seek and did not receive "admission" to the United States—indeed, the INA makes clear that humanitarian parole "shall not be regarded as an admission."  8 U.S.C. § 1182(d)(5)(A).

While his asylum application was pending, Plaintiff's U.S. citizen daughter filed a visa petition for him, which the government approved.  The only step between him and lawful permanent resident status (a "green card") is the Secretary's consent to apply for admission to the United States. But instead of adjudicating his request, the agency denied his application because it wrongly believed such an application could not be submitted by someone physically in the United States.

The Court should vacate the agency's decision.  The government's physical-presence requirement is contrary to law:  The statute requires only that a request for consent to apply for admission be made before the noncitizen attempts to be admitted.  It does not turn on physical presence in the United States, which is by itself not an indication that someone has been admitted. And because the agency's decision rests on no other premise, the Court should enter an order requiring the agency to adjudicate Plaintiff's application for consent to reapply for admission to the United States, so that he may obtain lawful status and live with his family.

## BACKGROUND

### A.    The Statutory and Regulatory Scheme

The INA comprehensively regulates the admission of noncitizens to the United States.  The statute provides multiple paths by which a noncitizen may seek and obtain admission to the United States.  A noncitizen may obtain an immigrant or nonimmigrant visa and then seek admission at the border.  *See* 8 U.S.C. §§ 1181, 1184.  Or a noncitizen who is in the United States—whether previously admitted at the border or not—may apply to "adjust" his or her status "to that of an alien lawfully admitted for permanent residence."  *Id.* § 1255(a).

Regardless of the path chosen, a noncitizen who applies for admission to the United States must establish that he or she is not *inadmissible* on any of a wide range of grounds enumerated in the statute.  8 U.S.C. § 1182(a).  One category of inadmissibility grounds arises out of a person's prior unlawful presence in, or removal from, the United States.  *Id.* § 1182(a)(9).  As relevant here, the INA makes inadmissible any person who "enters or attempts to reenter the United States without

being admitted" after either having been "unlawfully present in the United States for an aggregate period of more than 1 year" or having been "ordered removed" from the country. *Id.* § 1182(a)(9)(C)(i).  But the statute also sets out certain conditions under which otherwise inadmissible noncitizens may seek exceptions and waivers of inadmissibility grounds, one of which is at issue here.  8 U.S.C. § 1182(a)(9)(C)(ii) provides that the inadmissibility ground set out above "shall not apply to an alien seeking admission more than 10 years after the date of the alien's last departure from the United States if, prior to the alien's reembarkation at a place outside the United States or attempt to be readmitted from a foreign contiguous territory, the Secretary of Homeland Security has consented to the alien's reapplying for admission."

## B.    Plaintiff's Life In The United States And Mexico

Plaintiff was born in Mexico in 1966.  CAR 113.[1]  He is married and has four children.  *Id.* at 104.  Plaintiff's wife is a lawful permanent resident of the United States, and two of his children and his sole grandson are United States citizens.  *Id.* at 117-118, 120, 122, 124, 424.  Plaintiff is the sole provider for his wife, children, and grandson.  *See id.* at 426.  Plaintiff's friends and family attest to his moral character, describing him as honest, kind, and hard-working—a good husband and a loving father.  *Id.* at 261-313, 419.  He has no criminal record other than a 2001 misdemeanor conviction for driving under the influence.  *Id.* at 105.

Plaintiff first entered the United States over thirty years ago.  CAR 104.  He made a home in California and started a family.  *Id.*  In the ensuing decades, he returned to Mexico only for brief periods of time in order to care for his ailing parents.  In 2003, he was apprehended by U.S. Customs & Border Protection ("CBP") while crossing the U.S.-Mexico border and was removed.  *Id.* at 106; *see id.* at 609.  Although Plaintiff returned to the United States to be with his wife and children, he and his wife decided later that year to return to Mexico.  *Id.* at 106.  They moved to Plaintiff's hometown of Uruapan in the Mexican state of Michoacán, where they "began their lives again."  *Id.* Plaintiff and his wife each started successful small businesses, and Plaintiff was able to care for his aging parents.  *Id.*  They "thought [they] were back home for good."  *Id.*

---

[1] Citations to "CAR" are to the Certified Administrative Record, filed under seal on October 17, 2019 (ECF No. 28-3).  Plaintiff obtained leave to proceed under a pseudonym in this action because he fears persecution if his name were to be publicly revealed.  *See* ECF No. 11.

Roughly a decade after Plaintiff's return to Mexico, a violent cartel known as the Knights Templar began to gain power in Uruapan. CAR 107; *see also id.* at 340-372. The Knights Templar took over the local government and police force. *Id.* at 107. They seized people's land and imposed "taxes" on local businesses. *Id.* at 107-108. Plaintiff was opposed to the Knights Templar. *Id.* at 107. He complied with their demands because he was afraid: He knew community members who had resisted the Knights Templar and had been killed as a result. *Id.* at 108. One day, in January 2014, the Knights Templar kidnapped his son Jorge, held him for two days, beat him severely, and shot him in the side of his stomach before releasing him. *Id.* Later that spring, several armed Knights Templar members came to Plaintiff's business and threatened to kill him and his family members within three days if he did not comply with their demands. *Id.* Plaintiff "knew that if [they] stayed in Mexico, [his] wife, [his] children, and [he] only had three days to live." *Id.*

Plaintiff and his family fled Mexico for the United States. He arrived at the port of entry at Otay Mesa, San Diego, on June 26, 2014, presented himself to a CBP officer, and sought asylum in the United States. CAR 592-594; *see also id.* at 570-573. Plaintiff did not seek and was not granted admission into the United States in any immigrant or nonimmigrant visa status. After being detained for a month, an asylum officer found that Plaintiff had a credible fear that he would be tortured if he was returned to Mexico. *Id.* at 550-569. On August 22, 2014, the government granted Plaintiff humanitarian parole into the United States. *Id.* at 115. Plaintiff's parole document states that it is "not valid for … entry into the" United States. *Id.* The statute under which he was granted parole expressly states that parole "shall not be regarded as an admission of the alien." 8 U.S.C. § 1182(d)(5)(A); *accord id.* § 1101(a)(13)(B) ("An alien who is paroled under [§ 1182(d)(5)] … shall not be considered to have been admitted.").

After being paroled into the United States, Plaintiff relocated to the San Francisco Bay Area, where his brother resides. Plaintiff was placed into removal proceedings, where he could pursue his asylum claim. But because many members of Plaintiff's family are U.S. citizens and permanent residents, he is also eligible to pursue lawful permanent resident status by applying for admission to the United States via a family-based immigrant visa. Accordingly, in June 2015, Plaintiff's U.S. citizen daughter filed a Petition for Alien Relative (Form I-130) on his behalf. CAR 476. Plaintiff

simultaneously applied to adjust his status to become a lawful permanent resident.  *Id.* at 477.

Plaintiff also applied to DHS for consent to reapply for admission under 8 U.S.C. § 1182(a)(9)(C)(ii)

by filing Form I-212 (the "I-212 Application"), which he was required to do in order to waive his

inadmissibility under 8 U.S.C. § 1182(a)(9)(C).  *See* CAR 430.

Plaintiff's daughter's I-130 Petition was approved in March 2016, making an immigrant visa

number immediately available to Plaintiff.  CAR 417.  As a result, if the agency granted Plaintiff's I-

212 Application (allowing him to reapply for admission to the United States), Plaintiff would have a

clear path to adjust his status and become a lawful permanent resident.

**C.      USCIS's Unlawful Denial Of Plaintiff's I-212 Application**

The agency, however, proceeded—through a convoluted and time-consuming process—to

deny Plaintiff's applications on arbitrary and unlawful grounds that the agency ultimately did not

even try to reconcile with the statute.

Plaintiff appeared at a scheduled interview at the San Francisco USCIS Field Office on

January 11, 2016.  CAR 407.  Plaintiff—represented by counsel—brought his I-212 Application to

that interview, but the agency refused to accept it.  *Id.*

On October 27, 2016, Plaintiff received a letter from the USCIS Field Office denying his

application for adjustment of status.  CAR 432.  The letter informed Plaintiff that he was ineligible

to adjust status because he was inadmissible under 8 U.S.C. § 1182(a)(9)(C).  *Id.*  And it informed

him that he could not seek consent to reapply for admission under § 1182(a)(9)(C)(ii) because such

consent was available only to applicants "outside the United States."  CAR 433.  The letter also

stated that Plaintiff was supposedly inadmissible under 8 U.S.C. § 1182(a)(9)<u>(A)</u>—a separate

provision of the INA that does not apply to Plaintiff (as USCIS later conceded, *see* CAR 52).

Plaintiff sought reconsideration of USCIS's erroneous decision, resubmitting the I-212

Application in the process.  CAR 84.  In January 2017, USCIS agreed that the October 2016 decision

should be "set aside" and that Plaintiff's applications should be resubmitted for decision.  *Id.* at 69.

Over eighteen months later, on August 3, 2018, the Field Office issued a second decision,

again denying Plaintiff's application to adjust status and formally denying his I-212 Application.

CAR 47.  The Field Office recognized that Plaintiff had not been "admitted" to the United States,

agreeing that parole "does not constitute legal admission to the United States." *Id.* at 49.  But the Field Office nonetheless reasoned that Plaintiff had "attempted to be readmitted from a foreign contiguous territory" in June 2014, when he sought asylum at the United States border.  *Id.*; *see also id.* at 52.  Accordingly, it contended, Plaintiff had "not file[d] Form I-212 before" his "attempt to be readmitted" to the United States and was thus ineligible for consent to reapply for admission.  *Id.* at 50.

Plaintiff appealed the Field Office's decision to USCIS's Administrative Appeals Office ("AAO").  CAR 12.  On February 27, 2019—over three years after Plaintiff first submitted his applications—the AAO issued a final decision in Plaintiff's case, again denying relief.  *Id.* at 4.  The AAO's decision reached the same result on yet a third ground.  The AAO stated that "[e]very application … must be submitted to USCIS and executed in accordance with the form instructions," which in the case of the Form I-212 state that an applicant "may not file an application for consent to reapply" under 8 U.S.C. § 1182(a)(9)(C)(ii) if he or she is "in the United States." *Id.* at 5.  "Therefore," the AAO decided, "a Form I-212 requesting permission to reapply for admission under [§ 1182(a)(9)(C)(ii)] may not be filed by an applicant from within the United States and must be filed from abroad." *Id.*  The AAO purported to "acknowledge" Plaintiff's explanation that neither an asylum application nor a grant of parole constitutes "admission" to the United States.  *Id.* at 6.  But the AAO nonetheless concluded that "there is no provision allowing USCIS to adjudicate a Form I-212 requesting permission to reapply under [§ 1182(a)(9)(C)(ii)] filed from within the United States." *Id.*  The AAO did not explain why § 1182(a)(9)(C)(ii) itself was not sufficient authority in itself for USCIS to adjudicate Plaintiff's request.

## STANDARD OF REVIEW

The Administrative Procedure Act ("APA") requires this Court to "hold unlawful and set aside [any] agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

In this District, claims under the APA are resolved via motions for summary judgment.  *See* Civil L.R. 16-5.  In APA cases, "the district court acts like an appellate court," with a motion for summary judgment "serv[ing] as the mechanism for deciding, as a matter of law, whether the agency

1   action is supported by the administrative record and otherwise consistent with the APA standard of

2   review." *Tolowa Nation v. United States*, 380 F. Supp. 3d 959, 963 (N.D. Cal. 2019); *see Occidental*

3   *Eng'g Co. v. INS*, 753 F.2d 766, 769-770 (9th Cir. 1985).  In assessing the legality of agency action,

4   this Court reviews *de novo* the agency's interpretation or application of a statute, subject to whatever

5   degree of deference is applicable pursuant to *Chevron, U.S.A., Inc. v. Natural Resources Defense*

6   *Council, Inc.*, 467 U.S. 837 (1984), and related doctrines.  *See Snoqualmie Indian Tribe v. FERC*,

7   545 F.3d 1207, 1212 (9th Cir. 2008); *Schneider v. Chertoff*, 450 F.3d 944, 952 (9th Cir. 2006).  The

8   Court must vacate agency action as arbitrary and capricious where the agency has failed to "engage[]

9   in reasoned decisionmaking." *Judulang v. Holder*, 565 U.S. 42, 53 (2011); *see also Motor Vehicle*

10  *Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (vacatur required

11  where agency has failed to "articulate a satisfactory explanation for its action"); *Humane Society of*

12  *U.S. v. Locke*, 626 F.3d 1040, 1048 (9th Cir. 2010).

13                                      **ARGUMENT**

14  **I.     USCIS's Decision Is Contrary To Law**

15          The agency's decision is contrary to law and should be set aside.  The INA imposes only one

16  eligibility requirement with respect to the timing of a noncitizen's request for consent to reapply for

17  admission: that the request be made before the noncitizen "attempt[s] to be readmitted."  8 U.S.C.

18  § 1182(a)(9)(C)(ii).  But the agency has inexplicably and unjustifiably engrafted an atextual and

19  improper second eligibility requirement that the noncitizen be physically ***outside*** the United States

20  when the request is made.  The statute, however, attaches no importance to whether a noncitizen is

21  *physically present* in the United States, which is not the same as the question whether a noncitizen

22  has sought *admission* to the United States.  Because the two inquiries are different—and the

23  difference is dispositive in Plaintiff's case—the agency's decision should be "h[e]ld unlawful and set

24  aside," 5 U.S.C. § 706(2), and the case remanded to USCIS with instructions to adjudicate Plaintiff's

25  I-212 Application on the merits, without regard to his physical location.

26

27

28

**A.      The Government's Nonstatutory Physical-Presence Requirement Is Contrary To Law**

The statutory provisions at issue here are straightforward.  A noncitizen who re-enters the United States without being admitted after (a) having previously been removed or (b) having spent over a year in the United States unlawfully is inadmissible.  8 U.S.C. § 1182(a)(9)(C)(i).  He or she may nonetheless seek the Secretary of Homeland Security's consent to reapply for admission—in other words, to ask the Secretary to waive the inadmissibility ground—if he or she waits ten years outside of the United States and then seeks the Secretary's consent "prior to [his or her] … attempt to be readmitted from a foreign contiguous territory."  *Id.* § 1182(a)(9)(C)(ii).[2]  Plaintiff unquestionably satisfies the ten-year requirement:  He remained in Mexico for over a decade before returning to seek asylum.  *See* CAR 5.

The sole question for the agency was thus whether Plaintiff "attempt[ed] to be readmitted" to the United States, 8 U.S.C. § 1182(a)(9)(C)(ii), *before* he sought the Secretary's consent to reapply for admission—or at least that should have been the question the agency asked.  Instead, the agency asked a completely different question that is irrelevant under the statute.

The AAO decided that, notwithstanding the statute's plain terms, a noncitizen is categorically ineligible to seek the Secretary's consent under 8 U.S.C. § 1182(a)(9)(C)(ii) if he or she is physically present in the United States—a decision it appeared to base not on the statute, but on instructions for filling out the agency's own form.  *See* CAR 5 ("[A] Form I-212 … may not be filed by an applicant from within the United States and must be filed from abroad."); U.S. Dep't of Homeland Security, U.S. Citizenship & Imm. Servs., *Form I-212 Instructions For Application for Permission To Re-Apply For Admission Into The United States After Deportation Or Removal* 2-3 (last updated Apr. 27, 2018), https://www.uscis.gov/system/files_force/files/form/i-212instr.pdf ("[Y]ou **may not** file an application for consent to reapply if you are inadmissible under [§ 1182(a)(9)(C)] and … [y]ou

---

[2] The statute also provides that a noncitizen must seek such consent prior to his or her "reembarkation at a place outside the United States," if any.  8 U.S.C. § 1182(a)(9)(C)(ii).  The agency has never relied on that language, as Plaintiff arrived here via a land border and did not "go on board a boat or airplane."  *Cf., e.g.*, *Webster's Third New International Dictionary* 739 (2002) (definition of "embark").

are in the United States.").  But the agency did not tether its physical-presence requirement to the statute, which imposes no such rule.  The agency has improperly—indeed, unlawfully—engrafted a requirement onto the form that is found nowhere in the INA.

The INA itself makes plain that *admission* to and *physical presence* in the United States are distinct concepts with distinct statutory meanings.  The INA defines "'admission' and 'admitted'" to mean, "with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer."  8 U.S.C. § 1101(a)(13)(A).  That definition, standing alone, establishes that "admission" means something more than physical presence:  An admission is an entry to the United States that is made after "inspection and authorization by an immigration officer."  *Id.*[3]  Indeed, where Congress intended to make immigration status or some other benefit under the Act turn on physical presence—as opposed to admission—it said just that.  One provision of the INA, for instance, allows a noncitizen who is "physically present in the United States" to apply to adjust his or her status.  *Id.* § 1255(i)(1).  Another provision makes T visas—an immigrant visa afforded to victims of human trafficking—available only to noncitizens who are "physically present in the United States … or at a port of entry thereto."  *Id.* § 1101(15)(T)(i)(II).  Even the very statutory provision at issue here—§ 1182, which sets out inadmissibility grounds—uses the phrase "physically present" when that is the feature on which Congress wanted to condition relief.  *See id.* § 1182(6)(E)(ii) (inadmissibility ground for "smugglers" does not apply to certain noncitizens who are "physically present in the United States" and who helped their relatives enter the United States unlawfully).  The examples go on and on.  *See, e.g.*, *id.* § 1229b(b)(1)(A) (cancellation of removal available to nonpermanent residents who have been "physically present in the United States" for a period of ten years); *id.* § 1401(d) (person born outside of the United States to U.S. parent who has been "physically present in the United States" for one year or more acquires citizenship at birth).

---

[3] As the Ninth Circuit has explained, this definition was added to the INA for a reason: Before that statute's 1996 amendment, it "primarily distinguished individuals on the basis of 'entry' and not 'admission,'" meaning that noncitizens "who had effected an 'entry' into the United States" were afforded greater procedural protections even if that entry was unlawful.  *Hing Sum v. Holder*, 602 F.3d 1092, 1099-1100 (9th Cir. 2010).  That Congress replaced "entry" with "admission" as the primary criterion for those protections reflects the settled understanding that admission and physical presence after entry are not synonymous.

That Congress used the phrase "physical presence" throughout the INA "clearly demonstrat[es] that it knows how to [do so] when it wishes to." *Whitfield v. United States*, 543 U.S. 209, 216 (2005). It did not do so here.

The statute also plainly envisions that a noncitizen may be physically present in the United States ***without*** having been admitted. Most relevant here is the INA's provision authorizing the Secretary of Homeland Security to "parole into the United States temporarily under such conditions as he may prescribe" a noncitizen "for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A); *see also* 8 C.F.R. § 212.5. The statute explicitly states—and the agency below conceded, *see* CAR 45—that parole "***shall not be regarded as an admission*** of the alien." 8 U.S.C. § 1182(d)(5)(A) (emphasis added); *accord id.* § 1101(a)(13)(B) ("An alien who is paroled under [§ 1182(d)(5)] … shall not be considered to have been admitted."). This statutory distinction is consistent with the longstanding principle that, pursuant to the so-called "entry fiction," a parolee has not even *entered* the United States as a formal matter; from the INA's perspective, he or she remains outside the U.S. border. *See Leng May Ma v. Barber*, 357 U.S. 185, 190 (1958) (rejecting argument that noncitizen's "parole placed her legally 'within the United States'" as "inconsistent with the congressional mandate, the administrative concept of parole, and the decisions of this Court"). Absent some *other* "attempt to be readmitted," then, a noncitizen who has sought and obtained a grant of humanitarian parole remains eligible to seek the Secretary's consent to reapply to the United States pursuant to § 1182(a)(9)(C)(ii); the fact that such a person is physically present in the United States, standing alone, should not bar him or her from seeking such permission.

There are other situations in which a noncitizen may be physically present here without being "admitted" to the United States. For instance, a noncitizen physically present in the United States may seek and obtain relief from removal without seeking "admission." The Board of Immigration Appeals ("BIA") itself has held as much in multiple decisions. In *Matter of Reza*, 25 I. & N. Dec. 296 (BIA 2010), for instance, the noncitizen had entered the United States unlawfully but subsequently sought and obtained relief from removal under the Family Unity Program ("FUP"), a program that permitted certain relatives of lawfully present noncitizens to obtain temporary status in the United States. *Id.* at 297. Although the noncitizen argued that he had been "admitted" at that

time—thus rendering him eligible for another form of immigration relief—the BIA disagreed.  It explained that obtaining immigration benefits under FUP did not "involve [an] 'entry … into the United States after inspection and authorization by an immigration officer,'" and accordingly "declin[ed] to treat a grant of FUP benefits as an 'admission.'"  *Id.* (citing 8 U.S.C. § 1101(a)(13)(A)).

The BIA's opinion in *Matter of V-X-*, 26 I. & N. Dec. 147 (BIA 2013), is even more instructive.  The noncitizen in *V-X-* was paroled into the United States and obtained asylum the following year.  *Id.* at 149-150.  The noncitizen in *V-X-* argued that his grant of asylum constituted an "admission" under the INA, thus requiring the government to charge him as *deportable*, not merely *inadmissible*, in order to remove him from the United States.  *Id.* at 150; *see* 8 U.S.C. §§ 1182(a)(2), 1227(a).  The BIA disagreed, explaining that "nothing in the language of the [INA] … support[ed] [the noncitizen's contention] that Congress understood a grant of asylum to be a form of 'admission' into the United States."  *Id.* at 151.  To the contrary, the BIA reasoned, the regulations governing the process of applying for asylum at the U.S. border made clear that *no* such "admission" occurs at that time, given that "a grant of asylum does not require a threshold inspection for admissibility, the sine qua non of an 'admission.'"  *Id.* at 151 n.3.  Thus, under *V-X-* and *Reza*—as well as the plain language of the INA—a noncitizen may be physically present in the United States for many different reasons without having sought admission or having been admitted.

In sum, that a noncitizen is physically present in the United States does not necessarily mean that he or she has been admitted—nor even that he or she has, in the INA's terms, "attempt[ed] to be readmitted."  8 U.S.C. § 1182(a)(9)(C)(ii).  The AAO's decision equating the two was contrary to law.  And because the agency's decision rests on nothing more than that basic error, its decision should be vacated and the matter remanded for adjudication of Plaintiff's I-212 Application on the merits, without regard to his physical location.

## B.    The Agency Offered No Lawful Justification For Its Nonstatutory Physical-Presence Requirement

The AAO's decision barely attempts to justify its nonstatutory physical-presence requirement.  *See infra* pp. 15-16.  The agency's only stated explanation for its decision is that the

instructions to the Form I-212 purport to state a physical-presence requirement.  CAR 5.  But—to state the obvious—the instructions that an agency prepares to guide applicants in filling out a form do not carry the force of law, and certainly cannot trump an act of Congress.  *See Sierra Club v. EPA*, 671 F.3d 955, 962 (9th Cir. 2012) ("Interpretations ... contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference."); *cf. United States v. Mead Corp.*, 533 U.S. 218, 234 (2001) (such documents are "beyond the *Chevron* pale").  And while an agency's views may be "entitled to so-called *Skidmore* deference" even when set out in informal documents of that sort, *Sierra Club*, 671 F.3d at 962, the weight a court should place on such views "is a function of [their] thoroughness, rational validity, and consistency with prior and subsequent pronouncements," *Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1068 (9th Cir. 2003).  Here, the I-212 form's instructions provide no explanation for the physical-presence requirement they recite, and the AAO's decision offers no greater support for it.  There is accordingly no "informed judgment," *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), to which the Court could reasonably defer.

The AAO reasoned that Plaintiff's eligibility for consent under § 1182(a)(9)(C)(ii) could be resolved on the basis of the form instructions in part because those instructions, it asserted, "ha[d] the weight of regulations."  CAR 5.  This is so, the agency asserted, because DHS has promulgated a regulation providing that a DHS form's "instructions are hereby incorporated into the regulations requiring its submission."  8 C.F.R. § 103.2(a)(1).  Whatever effect that general regulation has, it cannot make the form instructions "law" in the sense that the interpretations they announce bind—or are owed deference by—the Court.  The form instructions themselves are not promulgated pursuant to notice-and-comment procedures; to the contrary, they are updated informally on the agency's website with little fanfare and no opportunity for public comment.  It is not unreasonable, of course, to ask a noncitizen to follow the rules and requirements set out in the form instructions.  But it is unreasonable—and incorrect—to suggest that the agency can somehow add nonstatutory eligibility requirements by purporting to "incorporate" them into the Code of Federal Regulations.  To the extent the government contends otherwise, the form instructions' physical-presence requirement is likewise invalid as contrary to law.  *See Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644,

661 (9th Cir. 2011) (vacating regulation "inconsistent with the statute" as "contrary to law" under the APA).

Finally, the AAO cited a DHS regulation and several opinions interpreting it in defense of its reading of the statute, but it did not genuinely rely on these authorities in making its decision—and for good reason, as they are all irrelevant here.  The issue presented in the cases cited by the AAO—*Matter of Torres-Garcia*, 23 I. & N. Dec. 866 (BIA 2006), and *Gonzales v. DHS*, 508 F.3d 1227 (9th Cir. 2007)—was whether the regulation cited by the AAO, 8 C.F.R. § 212.2, allowed a noncitizen who was inadmissible under § 1182(a)(9)(C)(i) to circumvent that inadmissibility ground on the theory that the regulation permitted noncitizens to seek consent to reapply for admission at the same time as they applied for adjustment of status and provided that such consent would be "retroactive to the date on which the alien embarked or reembarked at a place outside the United States."  8 C.F.R. § 212.2(i)(2); *see Torres-Garcia*, 23 I. & N. Dec. at 873-74.  The BIA rejected that argument.  *Id.* at 873.  It explained that the regulation—which did not refer to the requirements for seeking consent to reapply under § 1182(a)(9)(C)(ii)—"was not promulgated" to implement that section of the Act.  *Id.* at 874.  Rather, the BIA explained, the regulation was intended to implement a now-defunct section of the INA.  *Id.*  In *Gonzales*, the Ninth Circuit reviewed and adopted the BIA's opinion in *Torres-Garcia*, deferring to it under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), as a reasonable interpretation of the statute.  *Gonzales*, 508 F.3d at 1241-1242.

As this history reflects, none of these sources—§ 212.2, *Torres-Garcia*, or *Gonzales*—has any bearing on this case, given that § 212.2 does not interpret § 1182(a)(9)(C), the provision at issue here.  To the extent the AAO's discussion of these sources reflects its assumption that Plaintiff, like the noncitizen in *Torres-Garcia*, sought to invoke § 212.2(i)(2) as a "provision allowing USCIS to adjudicate a Form I-212 … filed from within the United States," CAR 6, that understanding is not correct:  The "provision" that Plaintiff believes authorizes—indeed, requires—the agency to do so is § 1182(a)(9)(C)(ii) itself.  And to the extent the AAO relied on dicta in *Gonzales*—namely, the statement that § 1182(a)(9)(C)(ii) "require[s] that [a noncitizen] obtain permission to apply for readmission *from outside the United States*," 508 F.3d at 1242 (emphasis added)—the AAO is incorrect.  The issue in *Gonzales* was whether the BIA's opinion in *Torres-Garcia* was reasonable

1    and should be deferred to under *Chevron*.  *See id.* at 1241.  And *Torres-Garcia* says nothing

2    whatsoever about whether § 1182(a)(9)(C)(ii) imposes a physical-presence requirement.  The

3    question at issue there, as discussed above, was whether 8 C.F.R. § 212.2, which permitted

4    noncitizens in some circumstances to *retroactively* waive certain inadmissibility grounds, applied to

5    § 1182(a)(9)(C).  In resolving that question, the BIA had no occasion to reach any issue relevant to

6    this case—and so *Gonzales*'s stray statement was no more than that.

7        **C.    The Government's Nonstatutory Physical-Presence Requirement Would Have**

8             **Devastating Effects For Asylum Seekers Like Plaintiff**

9        It is no wonder that Congress did not enact the physical-presence requirement that the AAO

10   seeks to engraft onto the statute:  It would have devastating consequences for asylum seekers like

11   Plaintiff, essentially requiring them to remain in the country from which they are trying to flee while

12   awaiting USCIS to adjudicate their I-212 applications.  Any reading of the statute leading to that

13   result cannot be correct.

14       Although federal law envisions that some refugees will seek permission to come to the

15   United States while they are overseas, it also specifically authorizes noncitizens to apply for asylum

16   in the United States either at the U.S. border or from within our borders.  *See* 8 U.S.C. § 1158; *INS v.*

17   *Cardoza-Fonseca*, 480 U.S. 421, 433 (1987).  That explicit grant of authority, as was explained

18   during consideration of the Refugee Act of 1980, "give[s] statutory meaning to our national

19   commitment to human rights and humanitarian concerns."  125 Cong. Rec. 23,231-23,232 (Sept. 6,

20   1979) (statement of Sen. Kennedy).  The statutory language is sweeping: It permits "[a]ny alien who

21   is physically present in the United States or who arrives in the United States … , irrespective of such

22   alien's status," to apply for asylum.  8 U.S.C. § 1158(a)(1).  Congress understood that some such

23   applicants would be fleeing "territory where their life or freedom was threatened" and would have to

24   "enter … [the United States] without authorization" before seeking asylum.  *East Bay Sanctuary*

25   *Covenant v. Trump*, 349 F. Supp. 3d 838, 856-857 (N.D. Cal. 2018) (quoting 1967 U.N. Protocol

26   Relating to the Status of Refugees, 19 U.S.T. 6223, 6275).

27       Under USCIS's reading of 8 U.S.C. § 1182(a)(9)(C)(ii), however—under which a person

28   who physically enters the United States is no longer eligible to reapply for admission—an asylum

applicant in that situation faces a paralyzing dilemma.  If he enters the United States, he will forfeit his ability to be formally and permanently admitted to the country.  But if he remains in the country he is trying to flee while he submits and awaits adjudication of his Form I-212, he places himself in grave danger—and may continue to be subjected to persecution or torture before his application for relief is adjudicated, thus imperiling his ability to obtain asylum at all.  Such a result is deeply contrary to the aims of the Refugee Act and of U.S. asylum law more broadly.  Congress did not intend to force an asylum seeker to wait in the country in which he reasonably fears persecution or torture while a bureaucratic process in the United States unfolds.  *See East Bay Sanctuary Covenant*, 349 F. Supp. 3d at 856-857.  Indeed, USCIS's interpretation of 8 U.S.C. § 1182(a)(9)(C)(ii) would—if upheld by this Court—have the deeply problematic effect of penalizing Plaintiff for having sought asylum in the United States.  Had Plaintiff not sought asylum, and merely filed an I-212 application from abroad, there would be no question that he was entitled to have his application adjudicated on the merits.  To punish him—indeed, to require his departure from the United States—for his decision to seek refuge here runs contrary to basic principles of U.S. asylum law.  And it speaks to the incongruity of USCIS's interpretation of the statutes at issue in this case.

## II.   USCIS's Decision Is Arbitrary And Capricious

The agency's decision should be vacated for a second, independent reason:  The agency wholly failed to justify the physical-presence requirement—the linchpin of its decision denying Plaintiff's application.  The APA requires a court to set aside agency action where the agency has failed to "articulate a satisfactory explanation for its action."  *Humane Society of U.S. v. Locke*, 626 F.3d 1040, 1048 (9th Cir. 2010) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)); *see also Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("[A] fundamental requirement of administrative law is that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action.").  In doing so, "[t]he reviewing court should not attempt itself to make up for [an agency's] deficiencies:  'We may not supply a reasoned basis for the agency's action that the agency itself has not given.'"  *State Farm*, 463 U.S. at 43 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

Here, the agency all but failed to provide *any* reasoned explanation for its decision.  The AAO's decision is four pages long, but the relevant analysis consists only of two paragraphs: one describing the form instructions and one addressing Plaintiff's arguments only obliquely.  *See* CAR 5-6.  As discussed above, however, the phrasing of a form's instructions does not show that the instructions comply with the law—and here Plaintiff clearly argued that a physical-presence requirement was not consistent with § 1182(a)(9)(C)(ii).  *See id.* at 29-30 (arguing that the agency's August 2018 decision "relies on an apparent misconception that physical presence on U.S. soil is necessarily the result of an attempt to be admitted to the United States").  Nor does the remaining paragraph, which discusses 8 C.F.R. § 212.2 and *Torres-Garcia*, address Plaintiff's argument in a meaningful way.  The essential premise of that paragraph is that "there is no provision allowing USCIS to adjudicate a Form I-212 requesting permission to reapply under [§ 1182(a)(9)(C)(ii)] filed from within the United States."  CAR 6.  But Plaintiff's entire argument was that § 1182(a)(9)(C)(ii) *itself* authorized—indeed, required—USCIS to adjudicate such an application, regardless of the physical location of the applicant.  The agency failed to meaningfully respond to that argument; indeed, it failed to even properly acknowledge it.

The agency's decision thus wholly fails to "articulate a satisfactory explanation for its action."  *Humane Society*, 626 F.3d at 1048.  Neither the Form I-212 instructions nor the AAO's decision makes any meaningful attempt to justify that requirement by reference to the statutory text.  That wholesale failure to supply a "reasoned basis for the agency's action," *State Farm*, 463 U.S. at 43, independently warrants vacatur.  Indeed, because there is *no* permissible basis on which the agency could have imposed a physical-presence requirement, given that such a rule is found nowhere in the statute, *see supra* pp. 8-11, the Court should vacate the agency's decision and require it to adjudicate Plaintiff's application on the merits.  At the very least, it should vacate the decision and remand the matter to the agency for further proceedings.

## CONCLUSION

For these reasons, the Court should grant Plaintiff's motion for summary judgment, vacate USCIS's decision, and order USCIS to adjudicate Plaintiff's I-212 Application on the merits without regard to his physical location.

1    DATED:        December 2, 2019

2

3                                                    By:___/s/  Alex Hemmer_____
                                                     ALEX HEMMER (*pro hac vice*)
4                                                    WILMER CUTLER PICKERING
                                                       HALE AND DORR LLP
5                                                    1875 Pennsylvania Ave. NW
                                                     Washington, DC  20006
6                                                    Telephone: (202) 663-6000
                                                     Facsimile: (202) 663-6363
7                                                    E-mail: alex.hemmer@wilmerhale.com

8                                                    MARK C. FLEMING (*pro hac vice*)
                                                     WILMER CUTLER PICKERING
9                                                      HALE AND DORR LLP
                                                     60 State Street
10                                                   Boston, MA  02109
                                                     Telephone: (617) 526-6000
11                                                   Facsimile: (617) 526-5000

12                                                   MARIE A.J. VINCENT (SBN 286240)
                                                     PANGEA LEGAL SERVICES
13                                                   350 Sansome St. #650
                                                     San Francisco, CA  94104
14                                                   Telephone: (415) 635-7187
                                                     Facsimile: (415) 593-5335

15                                                   *Attorneys for Plaintiff*

16

17

18

19

20

21

22

23

24

25

26

27

28